UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ZEBIN HOSSAIN,

*Plaintiff,*

– against –

UNILEVER UNITED STATES, INC.,

*Defendant.*

**MEMORANDUM & ORDER**
21-cv-02833 (NCM) (TAM)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Zebin Hossain brings this action against defendant Unilever United States, Inc., alleging that she suffered hair loss as a result of an allergic reaction to a preservative contained in TRESemmé Keratin Smooth shampoo, a Unilever product. *See* Compl., ECF No. 1. Before the Court are defendant's motions to preclude plaintiff's expert witness, Dr. Marc Serota, pursuant to Rule 702 of the Federal Rules of Evidence and for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, both of defendant's motions are **GRANTED**.

---

[1] The Court hereinafter refers to defendant's Memorandum of Law in Support of its Motion to Preclude, ECF No. 78-1, as the "Motion"; plaintiff's Memorandum of Law in Opposition to defendant's Motion to Preclude, ECF No. 79, as the "Opposition"; defendant's Reply Memorandum of Law in Further Support of its Motion to Preclude, ECF No. 80, as the "Reply"; defendant's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 75-1, as "MSJ"; defendant's Statement of Undisputed Material Facts, ECF No. 75-2, as "56.1 Statement"; plaintiff's Memorandum of Law in Opposition to defendant's MSJ, ECF No. 76, as "MSJ Opp'n"; plaintiff's Response to defendant's Statement of Material Facts, ECF No. 76-1, as "Counter 56.1"; and defendant's Reply Memorandum in Further Support of its MSJ, ECF No. 77, as "MSJ Reply."

## BACKGROUND

Plaintiff began using TRESemmé Keratin Smooth shampoo ("TRESemmé" or "the shampoo") at some point in 2017. Counter 56.1 ¶ 4.[2] The shampoo contains a preservative known as DMDM hydantoin ("DMDM"). Counter 56.1 ¶¶ 4–5. DMDM is a formaldehyde donor, a preservative that works by releasing small amounts of formaldehyde over time. MSJ 7–8; Compl. ¶ 26; *see* Def's Resp. to Pl's Stmt of Add'l Facts ¶ 18, ECF No. 77-1. Plaintiff alleges that DMDM may trigger an allergic reaction in some individuals that leads to dermatitis. Compl. ¶¶ 28–29.[3]

At some point in 2018, plaintiff began experiencing hair loss. Counter 56.1 ¶ 8. Despite her hair loss, plaintiff continued using TRESemmé until early 2020. Counter 56.1 ¶ 9. During this time, plaintiff washed her hair with the shampoo every other day. Counter 56.1 ¶ 10.

After plaintiff noticed her hair loss, she consulted with her primary care physician, Dr. Rishikesh Dalal. Counter 56.1 ¶ 16; *see id.* ¶ 15. At the time of the consultation, plaintiff was still using TRESemmé every other day. Counter 56.1 ¶ 17; *see id.* ¶ 11. Dr. Dalal's general practice is to document anything pertinent that a patient reports to him during their visit, and Dr. Dalal's medical records do not contain any mentions of dermatitis on plaintiff's scalp. Counter 56.1 ¶¶ 18–19. Ultimately, Dr. Dalal did not diagnose the cause of plaintiff's hair loss, but rather referred her to a dermatologist, Dr. Beau A. DiCicco. Counter 56.1 ¶¶ 20, 25.

---

[2]     The following facts, drawn from the parties' motion papers, Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

[3]     Defendant disputes this claim but not that plaintiff alleges this fact. *See* MSJ 8. Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers unless otherwise indicated.

Plaintiff stopped using TRESemmé a year and a half before consulting with Dr. DiCicco but continued to experience hair loss during that time. Counter 56.1 ¶¶ 27–28. When plaintiff eventually visited Dr. DiCicco for a consultation, he observed "non scarring hair loss in hormonal pattern," and diagnosed plaintiff with "androgenic alopecia," that is, genetic hair loss. Counter 56.1 ¶¶ 29–30. Dr. DiCicco prescribed plaintiff medication designed to treat genetic hair loss. Counter 56.1 ¶¶ 36–37. Plaintiff began taking that medication and, at the time of her deposition in this case, had increased her dosage from one pill daily to two pills daily. *See* Counter 56.1 ¶¶ 39–40. Plaintiff saw Dr. DiCicco multiple times, and he did not change his diagnosis. Counter 56.1 ¶¶ 33–34. Dr. DiCicco did not document any signs of dermatitis on plaintiff during any of her visits. *See* Counter 56.1 ¶ 35. Plaintiff's hair loss has improved since visiting Dr. DiCicco. *See* Counter 56.1 ¶ 39.

Plaintiff filed this action on May 19, 2021. In the Complaint, plaintiff alleges that defendant knew that its DMDM-containing shampoo could cause reactions leading to hair loss, but failed to reformulate its product with a safer alternative. Compl. ¶¶ 9, 36–43. Further, plaintiff alleges that her use of the shampoo caused her subsequent hair loss. Compl. ¶¶ 44–47. Accordingly, plaintiff brings product-liability causes of action on theories of manufacturing defect, design defect, failure to warn, and negligence. *See* Compl. ¶¶ 113–151.[4]

Plaintiff proffers one expert in support of her claims, Dr. Marc Serota. Counter 56.1 ¶ 48. Among his other qualifications, Dr. Serota is a board-certified pediatrician,

---

[4]    Plaintiff voluntarily dismissed her manufacturing defect claim. Pl's PMC Resp. 3 n.4, ECF No. 58.

dermatologist, and immunologist/allergist, as well as a practicing physician and lecturer. *See generally* Fearon Decl. Ex. 39 ("Serota CV"), ECF No. 76-38.

Defendant filed its motion for summary judgment along with its motion to preclude plaintiff's expert witness on October 23, 2025. *See* MSJ; Mot. Plaintiff opposes both motions. *See* MSJ Opp'n; Opp'n.

<b>MOTION TO PRECLUDE</b>

### I.    Legal Standard

Where scientific, technical, or other specialized knowledge will assist a jury to understand the evidence or to determine a fact in issue, Rule 702 allows a witness qualified as an expert by knowledge, skill, experience, training, or education, to offer their opinion if the testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) is "based upon sufficient facts or data," (3) is "the product of reliable principles and methods," and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.[5] Courts in this Circuit frequently distill Rule 702 down to a three-part test that requires the proponent of expert evidence to show that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact. *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Where, as here, the parties dispute an expert witness's reliability, a district court's inquiry "is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R.*

---

[5]    The parties do not dispute that Dr. Serota is "qualified" within the meaning of Rule 702.

4

*Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).[6] The Supreme Court has identified a number of factors bearing on reliability, including: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Id.* (citing *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)). At the same time, these factors are not a "definitive checklist or test," *Daubert*, 509 U.S. at 593, and "the gatekeeping inquiry must be tied to the facts of a particular case," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 591).

When analyzing the reliability of an expert's testimony, the district court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266. But because "conclusions and methodology are not entirely distinct from one another" a district court is not required to turn a blind eye and admit conclusions that have no basis in the facts from which an expert purportedly drew them. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Because Rule 702 requires that an expert use "reliable principles and methods," and that "the

---

[6]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

5

expert's opinion reflects a reliable application of the principles and methods to the facts of the case," Fed. R. Evid. 702, exclusion is appropriate "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Hasemann v. Gerber Prods. Co.*, Nos. 15-cv-02995, 16-cv-01153, 17-cv-00093, 2024 WL 1282368, at *7 (E.D.N.Y. Mar. 25, 2024) (quoting *Amorgianos*, 303 F.3d at 266).

Additionally, "expert testimony is subject to Rule 403, and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d at 397; *see* Fed. R. Evid. 403.

While "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," the Advisory Committee has instructed that such holdings "are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Expert testimony may not be admitted unless the party offering the evidence "demonstrates to the court that . . . the proffered testimony meets the admissibility requirements set forth in [Rule 702]" by a preponderance of the evidence. *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.*

"[C]ourts have wide latitude to decide whether to hold a *Daubert* hearing; no hearing is necessary if a motion challenging expert testimony can be decided on written submissions." *Evers v. Hoffman*, 822 F. Supp. 3d 295, 301 (E.D.N.Y. 2026).[7]

---

[7]   In light of the well-developed record in this case and voluminous submissions of the parties, no hearing is necessary. Accordingly, plaintiff's request for one, Opp'n 31 n.7, is denied.

## II. Discussion

The parties dispute the reliability of the analytical process Dr. Serota used to reach his opinion that plaintiff's use of TRESemmé shampoo caused her hair loss. In other words, whether his opinion is "based on sufficient facts or data" and "the product of reliable principles and methods," and whether it reflects a "reliable application of [his] principles and methods to the facts of th[is] case." Fed. R. Evid. 702(b)–(d).

Defendant contends that plaintiff cannot meet her burden to establish that Dr. Serota's opinion is reliable because Dr. Serota (1) formed his opinion without conducting diagnostic procedures normally performed by dermatologists outside of the litigation context, Mot. 22–25, (2) ignored facts that contradicted his causation theory, Mot. 26–28, (3) failed to conduct any tests that would confirm or refute his theory, Mot. 28–30, and (4) did not rule out other potential causes of plaintiff's hair loss. Mot. 30–31.

Plaintiff counters that Dr. Serota formed his opinion by employing sufficiently reliable diagnostic techniques, including "(1) a video interview and examination of [plaintiff] and numerous injury photos; (2) [plaintiff]'s medical history and records; (3) a timeline showing that [plaintiff] never suffered hair loss prior to using TRESemmé, the onset of severe scalp reactions and hair loss after using TRESemmé, and partial hair regrowth after she switched to other hair care products; (4) dozens of peer reviewed medical and scientific articles; (5) evidence establishing that hundreds of [d]efendant's customers reported that they too suffered scalp injuries and hair loss after using TRESemmé containing DMDM; and (6) [his] own education and medical experience as a practicing dermatologist and allergist/immunologist who regularly treats patients suffering from contact dermatitis of the scalp and contact dermatitis-caused hair loss." Opp'n 7. Given Dr. Serota's consideration of "adequate facts and data," Opp'n 23, plaintiff

7

asserts that she has met her burden, Dr. Serota's opinion is admissible, and defendant's arguments regarding the veracity of his methodology and conclusions go to weight, not admissibility, Opp'n 24–25.[8]

Dr. Serota's general causation methodology involved a review of "dozens of peer-reviewed medical and scientific articles and studies" combined with his "experience as a practicing dermatologist." Opp'n 22–23. From this information, Dr. Serota concluded that DMDM "commonly causes contact dermatitis." Opp'n 23. Dr. Serota employed a similar methodology to conclude that "dermatitis of the scalp can cause hair loss," grounding his opinion in medical literature and his own personal experience as a practitioner. Opp'n 23.

Dr. Serota's formed his theory on specific causation by reviewing "plaintiff's medical history and medical records;" "the narrative of the sequence and nature of her TRESemmé use and her hair loss;" "numerous scalp and hair photos provided (including contemporaneous photos of scalp discoloration and hair loss);" and "internal injury reports to [d]efendant from TRESemmé users stating they had suffered contact dermatitis-like reactions and hair loss after using TRESemmé." Opp'n 24. Dr. Serota also examined plaintiff's scalp and conducted a virtual interview with her. Opp'n 24; Lambert Decl. Ex. A ("Serota Report") ¶ 40, ECF No. 78-7. Finally, Dr. Serota claims to have

---

[8]   The Court rejects plaintiff's suggestion that defendant's failure to challenge Dr. Serota's qualifications means all other disputes go to the weight of his testimony. Opp'n 8, 24–31. "[T]he proponent must show each of the three reliability components of Fed. R. Evid. 702, *i.e.*, Fed. R. Evid. 702(b)–(d), by a preponderance of the evidence." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-02542, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025). Therefore, it is only "once the court has found it more likely than not that the admissibility requirement has been met" that an "attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

performed a "differential diagnosis" which is a "process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 474 (E.D.N.Y. 2011).

Dr. Serota's theory proceeds in two steps. First, he explains that contact with products containing DMDM can cause dermatitis where a person is allergic to DMDM (allergic contact dermatitis), or where a person is in contact with a sufficiently large amount of DMDM for a sufficiently long period of time (irritant contact dermatitis). Serota Report ¶¶ 8, 14, 41. Second, he says that dermatitis can lead to hair loss. Serota Report ¶¶ 22–23, 25.

Dr. Serota opines that this sequence of events is what happened to plaintiff. Serota Report ¶ 42 ("[I]n this case DMDM triggered a dermatitis leading to alopecia."); *see* Lambert Decl. Ex. E ("Serota *Hossain* Tr.") 5:06–13, ECF No. 78-11 ("Question: Did you come to an opinion as to which [type of dermatitis] of those you are opining applies here? Answer: Typically, DMDM would cause an allergic contact dermatitis, although some patients can have an irritant dermatitis to irritating substances as well. So it is not possible to say for sure, but most likely allergic contact dermatitis.").[9] In other words, the theory

---

[9] Dr. Serota has been deposed three times in three similar cases: (1) in this action ("Serota *Hossain* Dep."); (2) in *Detmar v. Unilever United States, Inc.*, No. BER-L-2399-21 (N.J. Sup. Ct.) ("Serota *Detmar* Dep."); and (3) in *Candelaria v. Conopco, Inc.*, No. 21-cv-06760 (E.D.N.Y) ("Serota *Candelaria* Dep."). For the sake of efficiency, the parties agreed that defendant may use Dr. Serota's deposition transcripts in each of the related actions. Lambert Decl. ¶ 9, ECF No. 78-6. The Court references Dr. Serota's depositions accordingly.

underpinning Dr. Serota's opinion requires that plaintiff had a reaction to the DMDM in the shampoo and that reaction led to dermatitis-induced hair loss.[10]

As discussed in greater detail below, Dr. Serota failed to confirm or rule out whether plaintiff had any allergies at all and ignored the fact that her medical records contained neither evidence of allergies nor dermatitis. Further, Dr. Serota's deposition testimony contradicts the conclusion in his report that plaintiff suffered from dermatitis. And contrary to plaintiff's assertion, he did not rule out at least one other obvious potential cause of hair loss, namely the fact that plaintiff dyed her hair regularly during the relevant time period. Accordingly, Dr. Serota is "unable to tie [his] conclusion to the facts presented by this case," *Zwillinger v. Garfield Slope Hous. Corp.*, No. 94-cv-04009, 1998 WL 623589, at *18 (E.D.N.Y. Aug. 17, 1998), leaving "too great an analytical gap between the data and the opinion proffered" for it to be admissible. *Amorgianos*, 303 F.3d at 266.

Dr. Serota conducted no diagnostic testing to determine whether or not plaintiff had a DMDM allergy. Serota *Hossain* Tr. 50:15–51:14 ("I was asked to opine on the records that were available to me."). While plaintiff is correct that "an expert does not need to conduct every diagnostic test to assert a reliable causation opinion *if the opinion*

---

[10]    While Dr. Serota stated in his deposition that plaintiff's use of TRESemme "most likely [caused an] allergic contact dermatitis," Serota *Hossain* Tr. 5:06–13, in his report he states that plaintiff's recovery is "consistent with irritant contact dermatitis," Serota Report ¶ 40, and ultimately concludes that "DMDM triggered *a dermatitis* leading to alopecia." Serota Report ¶ 42 (emphasis added). It is unclear whether plaintiff's argument is that Dr. Serota did not need to conduct any allergy testing because DMDM triggered an irritant contact dermatitis. But to the extent that is plaintiff's argument, it is unavailing in light of the contradictions between Dr. Serota's report and his deposition testimony, as well as the gaps in his application of his purported theory to the facts of this case, both discussed *infra*.

*is based on other forms of reliable diagnostic data,*" Opp'n 27 (emphasis added), Dr. Serota did not, and indeed could not, rely on diagnostic testing performed by other medical professionals. That is because plaintiff "has never been tested for any allergies." Counter 56.1 ¶ 42 (citing Lambert Decl. Ex. B ("Pl's Dep. Tr.") 140:10–16, ECF No. 78-8).[11]

Plaintiff tries to minimize this fact by pointing out that she "was not experiencing active hair loss when Dr. Serota was performing his work on this case," Opp'n 28, but that does not explain why he failed to even offer her a patch test when that was his practice in the "normal course" of treating patients. Serota *Hossain* Tr. 50:15–51:14; *see also id.* 19:11–19 ("Question: I have seen reference to various articles [referring to] the patch test[] []as a gold standard for allergic contact dermatitis testing. Do you agree with that? Answer: Yes."). And in any case, plaintiff's lack of active hair loss at the time of Dr. Serota's examination is irrelevant to whether a patch test—which involves exposing a person to an allergen to see if the allergen creates a reaction—would "have provided any material information necessary for Dr. Serota to form reliable opinions." Opp'n 28. On the contrary, a patch test could have confirmed, or at least made more plausible, that Dr. Serota's allergic contact dermatitis theory applied to plaintiff. Serota *Detmar* Tr. 71:21–25 ("In the scenario where there is [] a contact dermatitis, the dermatitis is triggered by the allergen, which causes the rash and the dermatitis. And then that inflammatory response then causes the alopecia.").

---

[11] Due to the formatting of this transcript, Lambert Decl. Ex. F ("Serota *Detmar* Transcript"), ECF No. 78-12, Lambert Decl. Ex. C ("Delal Dep. Tr."), ECF No. 78-9, and Lambert Decl. Ex. D. ("DiCicco Dep. Tr."), ECF No. 78-10, citations are to the page number that appears in the PDF and not to the page number that appears on the ECF header.

Nonetheless, plaintiff argues that Dr. Serota's opinions are adequately supported in the absence of any diagnostic testing because he "considered and relied on various other objective facts and data" including plaintiff's "medical history and medical records"; his interview with plaintiff and the "narrative of the sequence and nature of her TRESemmé use and her hair loss"; and "numerous scalp and hair photos." Opp'n 24.[12] But these facts and data undermine, rather than support, the way in which Dr. Serota applied his theory.

First, plaintiff's medical records and medical history indicate no signs of any allergies or dermatitis. Neither Dr. Dalal nor Dr. DiCicco, both of the whom plaintiff consulted regarding her hair loss, diagnosed her with dermatitis. Plaintiff saw Dr. Dalal while she was still using TRESemmé. Pl's Dep. Tr. 37:01–03; Counter 56.1 ¶ 17. Dr. Dalal testified that his general practice is to "document anything pertinent that the patient reported to [him] during [his] visit." Dalal Dep. Tr.14:11-17. Yet plaintiff's medical records contain no mention of dermatitis. Counter 56.1 ¶ 18.

Plaintiff saw Dr. DiCicco after she had discontinued using TRESemmé but while she was actively experiencing hair loss. Pl's Dep. Tr. at 102:8–18. Dr. DiCicco diagnosed plaintiff with "[a]ndrogenic alopecia," that is, hereditary hair loss. DiCicco Dep. Tr. 9:10–10:17; 40:14–41:08. Dr. DiCicco's medical records do not document any signs of dermatitis on plaintiff's scalp. Serota *Hossain* Tr. 75:18–76:15.

---

[12]    Plaintiff also contends that Dr. Serota "reviewed internal injury reports to [d]efendant from TRESemmé users stating they had suffered contact dermatitis-like reactions and hair loss after using TRESemmé," Opp'n 24, but does not explain how reports from other individuals who suffered "dermatitis-like reactions" would support his conclusion that plaintiff suffered from dermatitis here.

Dr. Serota dismissed Dr. DiCicco's diagnosis because "as a result of the passage of approximately one year between when [plaintiff] began experiencing hair loss and her examination by Dr. DiCicco, there likely would have been no remaining, existing dermatitis from the DMDM in the TRESemmé." Serota Report ¶ 39. But the fact that any dermatitis would have subsided by the time plaintiff saw Dr. DiCicco does not suggest nor in any way support that plaintiff had dermatitis in the first place.

Second, Dr. Serota's deposition testimony calls into question whether he did in fact review "numerous scalp and hair photos." Opp'n 24. During his deposition, Dr. Serota was presented with photographs depicting plaintiff's scalp while she was actively using TRESemmé shampoo and which, by her own admission, depicted the full extent of her scalp irritation. Pl's Dep. Tr. 73:05–10 ("Question: At any point in time when you were using TRESemmé shampoo, did you experience any scalp irritation that looked different than what is depicted on the picture on Hossain 18 and 19? Answer: No"). Dr. Serota testified that those pictures did not show any signs of dermatitis, Counter 56.1 ¶ 14, and that he "would argue against" a finding of dermatitis based on the pictures if they had been taken "within 48 hours or so" of using the shampoo, Serota *Hossain* Dep. Tr. 65:21–66:08; 68:18–25; 67:01–02.[13]

As it turns out, those photos were taken "within 48 hours or so" of plaintiff washing her hair with the shampoo. Counter 56.1 ¶ 11 ("During the period that Plaintiff used TRESemmé, Plaintiff washed her hair with TRESemmé every other day"). Given that these photographs reflected the full extent of plaintiff's scalp irritation, and the fact that

---

[13]    The pages in this transcript were filed out of order. In this Exhibit, page 68 corresponds with what was originally page 170 of the transcript and page 67 corresponds with what was originally page 171 of the transcript.

at this time plaintiff "washed her hair with TRESemmé every other day," it is difficult to reconcile Dr. Serota's observation that the photographs reflected no signs of "inflammation", "rash[]", "scaling", or—crucially—"dermatitis", Serota *Hossain* Dep. Tr. 65:21–66:08, with his opinion that "in this case DMDM triggered a dermatitis leading to alopecia." Serota Report ¶ 42.

Plaintiff tries to minimize this as a "minor" oversight that is "immaterial." Opp'n 25. But that cannot be true given that the entire basis for Dr. Serota's opinion is that plaintiff's hair loss was triggered by DMDM-induced dermatitis. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. Indeed, "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267. Yet here, Dr. Serota's deposition testimony confirms that if he had seen plaintiff's scalp at the time she was using TRESemmé shampoo every other day and at the height of its irritation, he would have "argue[d] against" a dermatitis diagnosis. Serota *Hossain* Dep. Tr. 67:01. That is not a "minor flaw in [Dr. Serota]'s reasoning" but rather one that suggests that he "lacks good grounds for his . . . conclusions." *Amorgianos*, 303 F.3d at 267. That suggestion is especially strong in light of plaintiff's assertion that an allergy test was not required because Dr. Serota reviewed "relevant medical records[] [and] medical history" Opp'n 27.

Dr. Serota appears to have largely based his opinion on timing and plaintiff's own self-reported narrative of events. Indeed, plaintiff makes much of the "timeline that Dr. Serota carefully considered." Opp'n 13–16; *see* MSJ Opp'n 19 ("Dr. Serota considered the compelling temporal relationship between Ms. Hossain's use of TRESemmé, the onset of Ms. Hossain's contact dermatitis and hair loss, and her partial recovery after she stopped

14

using TRESemmé."). But "an expert's opinion should be grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms." *DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 237 (S.D.N.Y. 2010). As discussed above, here, it is not. And as discussed below, the temporal relationship here is not even particularly strong, as would be necessary for it to be "one of several factors considered by a medical doctor to reliably determine causation." *Raymond v. Mitchell*, No. 18-cv-01467, 2024 WL 2941847, at *10 (N.D.N.Y. June 11, 2024).

In Dr. Serota's report he observes that "prior to 2019, [plaintiff] did not experience or report any significant hair loss." Serota Report ¶ 30. He then states that, "after beginning [to] use" TRESemmé shampoo plaintiff "reports having an itchy and tender scalp followed by unusual hair loss from the top of the head." Serota Report ¶ 34. Finally, he notes that his video examination, which occurred after plaintiff had discontinued her use of the shampoo, revealed that plaintiff "ha[d] regrown hair on the top of her scalp where she had previously lost hair. . . . [which] is *consistent* with irritant contact dermatitis that led to hair loss." Serota Report ¶ 40 (emphasis added).

The tenuous notion that this timeline is suggestive of a causal link is undermined by Dr. Serota's deposition testimony. In his deposition, Dr. Serota stated that that it "was not clear to [him]" whether plaintiff's recovery was attributable to the androgenic alopecia medication she was taking or the fact that she had discontinued the use of the shampoo. Serota *Hossain* Dep. Tr. 72:11–21; *see Nimely*, 414 F.3d at 399 (finding unreliable an expert witness who "conceded on cross-examination[] [that] the medical data that he analyzed were susceptible of numerous interpretations" including a conclusion directly contrary to his expert opinion). Further, Dr. Serota said that it would be "speculative" for him to opine on that point. Serota *Hossain* Dep. Tr. 73:12–19. Accordingly, one of the

15

three pillars upon which Dr. Serota's temporal analysis is built—the fact that plaintiff recovered after she stopped using TRESemmé—offers little, if any support at all.

Similarly, while plaintiff claims, and Dr. Serota attests, that he "considered and rejected the alternative causes of [plaintiff]'s hair loss," Opp'n 28; Serota Report ¶ 37, it is not clear that he did. Indeed, Dr. Serota testified that he did not rule plaintiff's practice of dyeing her hair "in or out" as a cause of her hair loss. Serota *Hossain* Tr. 60:08–22 ("Question: Do you recall when [plaintiff] started dy[e]ing her hair? Answer: I don't remember. Question: Do you know if it was around the period when she started losing her hair? Answer: I don't recall when she began dy[e]ing her hair. Question: Would that have been relevant to you? Answer: Yes. Question: And did you rule out that hair dyes can be a cause of her hair loss? Answer: I don't know that I ruled it in or out. I do recall that I reviewed that she did have a history of dy[e]ing her hair."). Given that plaintiff has dyed her hair "every three to four months" since 2017, Counter 56.1 ¶ 43, and that Dr. Serota testified that hair dyeing is a potential cause of hair loss, Serota *Hossain* Tr. 10:08–09, his failure to account for this variable further undermines his conclusion that TRESemmé caused plaintiff's hair loss. Serota Report ¶ 42; *see Amorgianos*, 303 F.3d at 268 (affirming district court's rejection of expert's testimony where he "did not find it necessary to include" certain variables in his calculation "despite his stated opinion that a proper [] assessment would take [those variables] into consideration"). Plaintiff is correct that Dr. Serota "need not eliminate all possible causes of [plaintiff]'s injury for his causation opinion to become admissible, Opp'n 22, but "the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Deutsch*, 768 F. Supp. 2d at 474. Dr. Serota, by his own admission, did not.

16

In sum, Dr. Serota failed to conduct tests that would have bolstered his theory and disregarded facts that undermined it, including the diagnoses of other medical providers. His opinion is largely based on plaintiff's self-reported narrative and a timeline that is, at best, suggestive of a correlation between when she began using TRESemmé and when she began losing her hair. Put differently, his opinion is not "based on sufficient facts" nor is it "the product of reliable principles and methods" as is required by Rule 702. Fed. R. Evid. 702 (b)–(c). And as the foregoing discussion illustrates, Dr. Serota's opinion does not "reflect[] a reliable application of the principles and methods to the facts of [this] case." Fed R. Evid. 702(d). Because Dr. Serota's opinion is largely based in "unverifiable subjectivity," *Nimely*, 414 F.3d at 399, it is not "helpful to the trier of fact in comprehending and deciding issues beyond the understanding of a layperson," *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013), and must be excluded.[14]

## MOTION FOR SUMMARY JUDGMENT

### I.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13

---

[14]    The Second Circuit has advised that where "the unreliable portion of an [expert] opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016). Here, the unreliable portion of Dr. Serota's opinion goes directly to specific causation. And as discussed below, plaintiff cannot establish that element of her case absent expert testimony. Accordingly, the Court is "not obligated to prune away all of the problematic elements of [Dr. Serota]'s proposed testimony to save the remaining portions." *Id.*

F.4th 247, 259 (2d Cir. 2021). Facts are in genuine dispute when "the jury could reasonably find for" the non-moving party based on the evidence in the record. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

On review of a Rule 56 motion, the Court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Brandon v. Royce*, 102 F.4th 47, 54 (2d Cir. 2024). The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). Where the moving party meets their burden, the non-moving party must provide sufficient evidence establishing a genuine issue of material fact beyond "[t]he mere existence of a scintilla of evidence." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012). The court need only consider admissible evidence and is not obligated to conduct an independent review of the record to identify a factual dispute. *Looney v. Macy's Inc.*, 588 F. Supp. 3d 328, 340 (E.D.N.Y. 2021).

A district court's role is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Furthermore, "a district court may not make credibility determinations[] or weigh evidence" on summary judgment. *Reynolds v. Quiros*, 990 F.3d 286, 294 (2d Cir. 2021). Thus, a district court denies summary judgment where there are disputed facts "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019).

## II.     Discussion

Defendant argues that if Dr. Serota's opinion and testimony are precluded, plaintiff's claims fail as a matter of law because a party "must offer admissible expert testimony" to establish causation. MSJ 10. At the outset, defendant misstates the law on this point. "New York law is clear that expert testimony with reference to proximate causation is not always required." *See Colwell v. Sig Sauer, Inc.*, 177 F.4th 382, 392 (2d Cir. 2026) (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110 (1983)). Nonetheless, based on "the facts of th[is] case," the Court agrees that plaintiff cannot establish causation absent Dr. Serota's testimony because the issues here are "beyond the sphere of the ordinary [member of the] jury[]." *Id.* at 393.

"Causation is a required element in every products liability case." *Daniels-Feasel v. Forest Lab'ys Inc.*, No. 17-cv-04188, 2021 WL 6137093, at *2 (S.D.N.Y. Dec. 29, 2021), *aff'd sub nom. Daniels-Feasel v. Forest Pharms., Inc.*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023). A plaintiff must establish both general and specific causation to prevail in such a case. *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 401–02 (S.D.N.Y. 2005). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* at 402.

Here, to satisfy her burden at trial plaintiff would have to demonstrate, absent the opinion or testimony of Dr. Serota, that (1) DMDM in the concentrations found in TRESemmé can cause a reaction leading to dermatitis, (2) dermatitis can lead to hair loss, and (3) her use of TRESemmé caused her to have an allergic reaction resulting in dermatitis-induced hair loss. Based on the evidence in the record, she cannot. As discussed above, Dr. Serota's opinion on specific causation is inadmissible. Thus, even if

19

Dr. Serota could opine on the ability of DMDM to cause dermatitis-induced hair loss, plaintiff's claim would still fail because she cannot establish that DMDM caused her to develop dermatitis that in turn led to her hair loss.

This is not a case in which "the causation question will be obvious to a jury." *Colwell*, 177 F.4th at 393. Indeed, plaintiff does not argue that it is. *See* MSJ Opp'n 8 ("Defendant's summary judgment motion relies heavily on its misguided presumption that the Court will exclude the opinions of Ms. Hossain's expert, Dr. Serota . . . ."); *see id.* 17–20 (arguing that Dr. Serota's opinion establishes general and specific causation). Rather, this case is analogous to those involving "toxic exposures or pharmaceuticals" which "almost always require expert testimony as to causation." *Colwell*, 177 F.4th at 393. The lay juror will not understand the toxicology or chemistry of DMDM and whether it is capable of causing dermatitis—much less dermatitis-induced hair loss. And the lay juror will certainly not be able to determine whether that particular chain of events happened to plaintiff. With the testimony of Dr. Serota excluded, plaintiff cannot proffer any expert witness testimony on causation. Accordingly, she cannot prove an essential element of her claims, and summary judgment must be entered in favor of defendant.

## CONCLUSION

Even granting that Dr. Serota is qualified to opine on the ability of DMDM to cause dermatitis, and dermatitis to cause hair loss, his opinion here is grounded in insufficient facts and data, and his methodology was unreliably applied to plaintiff in this case. At best, his opinion would not be helpful to the lay juror and, at worst, it might actively mislead or confuse them. Therefore, defendant's motion to preclude is **GRANTED**. And because plaintiff puts forth no other expert witnesses who can testify to causation, she fails to establish a necessary element of her claims. Accordingly, defendant's motion for

20

summary judgment is also **GRANTED**. The Clerk of Court is respectfully directed to enter judgment and to close the case.

**SO ORDERED.**

              *Natasha C. Merle*
NATASHA C. MERLE
United States District Judge


Dated:       July 30, 2026
             Brooklyn, New York